In August 2008, three shrapnel-laden pipe bombs exploded in front of the San Diego Federal Courthouse. The first claim in this appeal is that defendant Donny Love was denied a fair trial by an impartial jury because his trial was held at the very same courthouse that he was charged with bombing. And in usual circumstances here, holding the trial at the very same courthouse he was charged with bombing, creating an unfair risk that the The bombing took place in the front of the building, correct? At the entrance? Correct. Is that right? Yes. And didn't the judge take steps to mitigate any, you know, she had the jury come in on the side, side entrances and up through the jury room? The jury did, that's correct, that the jury was not permitted to enter through the front of the courthouse, they went to the side. But the argument is that having the trial in the courthouse itself Was there any hint that they didn't comply with her directives? There's nothing in the record to that effect. So your concern is just that the trial took place right there in the same building? Yes, that the kind of emotional impact of those circumstances, having it take place in that building When I looked at the voir dire, it seemed that most of the jurors didn't think that would be a problem. So the jurors were questioned, you know, before the trial took place. And I think it's a kind of a prejudice that is difficult for, or near impossible for a juror to be able to predict how they would feel later. And I think in some cases, when we talk about actual prejudice, you look at the voir dire transcript, and you determine whether the jurors were actually prejudiced. But in a case like this, it's more akin to a presumed prejudice where the atmosphere of a, usually in a pretrial publicity case But counsel, I mean, this is obviously not the first case in the history of the United States that involves some difficult issues like that. But the only case you cited, really, that has come anywhere close from your perspective is a 2002 Missouri case, which is easily distinguishable. If this is that big of a problem, when it's three years later, people go through the side door, the jurors all say there's not a problem, no one was killed, nobody was hurt, no jurors were intimidated in that situation. Why is this a problem? I don't understand how this rises to a level so heinous that he can't get a fair trial in this place. Well, the fact that there's not a lot of cases on point is probably due to unusual circumstances. There's not a lot of real serious violent crimes that occur in courthouses, especially after metal detectors. But we have a situation where if you put Timothy McVeigh on one side, where the district court granted a change of venue, and you put Nettles, the Seventh Circuit case, on the other side, where no bombing actually went off, this case is somewhere in the middle. In the Missouri Supreme Court case, I think this one is relatively close to there. Well, aren't you really getting close to saying that it's per se presumed where you have the circumstances such as this, you have an explosion that's in the courthouse, and you can't mitigate it in any respect? I think that's essentially my argument, is when there's... And I think you have to look at all the circumstances of the offense and the crime. But in a case like this, where it wasn't just a bomb went off in the front of the courthouse, it was three pipe bombs together that had 110 galvanized nails that the prosecution emphasized by playing a video to start off their opening statement. They referred to it in their closing. They had expert agent testimony about the damage to the courthouse. It damaged the blast-resistant windows. It actually... A projectile went through the x-ray machine and the optical turnstiles. And in those circumstances, the jury cannot really, I think, determine whether or not they'll be impacted. And I think that the... Doesn't the proximity or lack of proximity of the bombing make a difference here? This was three years approximately after the event, was it not? Yes. And I think that would be a much stronger factor for the government in a publicity case, because I think publicity, you forget about what you heard on TV three years ago. But this type of a prejudice claim, I think, is different. I think it doesn't make as much of a difference if it occurred a year later or three years later. What about 10 years later? Or 20? Well, it may have some impact as time goes on. It may lessen its impact. But the time difference in your mind perhaps does play a difference. I think it's a very minor factor, and it's much less so than with pretrial publicity. And in this case, where it occurred three years later, some of the jurors still remember the offense, and there was testimony about the damage to the courthouse. I don't think that was an important factor. The essence of the claim is what the district judge said in McVeigh, is that prejudice is not just limited to bias or discriminatory attitude. It includes the impairment of the and is more powerful when it generates a strong emotional response. Moving to my second claim. The second claim is that essentially the district court erred in denying Love's request for new counsel. I want to focus on this first request, which was on September 1, 2010. He submitted a two-page pro se request with 12 reasons why there was an irreconcilable conflict with his counsel, and concluded that he lost faith with his attorney. The court looks at three factors in looking at this claim. So just to make sure I understand what happened, the district judge then sets a hearing. Is that correct? There was a hearing. She set a hearing. It set a hearing, and then it was vacated. Right. She set a hearing, and in between, Mr. Love writes a letter to the court. Is that correct? As well as following up on his motion? I think about the same time he submitted his motion, he sent a letter to your colleague Judge McEwen at the Ninth Circuit Court of Appeals. But she strikes that. She says, this is improper. She just strikes it. So there's a motion that's set for hearing, correct? Right. And then what happens? And then at the time, the next thing that happens is that the district judge denies the motion in a one-page order without prejudice to renewal, vacates the hearing after the trial, after a second request for a new attorney, after a motion for a new trial. We learn in her order that counsel contacted Chambers. Correct. That everything is okay. Right. I talked with my client, and that the motion's withdrawn, or that everything's okay. The argument here is that that is not an appropriate, sufficient inquiry in these circumstances where a defendant files a pro se motion without the knowledge of his attorney for the court just to accept the representation of the defense counsel when the defense counsel's interest may be... After he filed that motion, when was the next time that there was a court hearing? So he filed... Wasn't it in May, just before trial? There was a hearing on May 10th, 2011. I'm not certain. I have to check the docket sheet whether there was a hearing in between then, but the next hearing that I'm aware of was about nine months later. There was one before trial, and there was this colloquy with the defendant present and his attorney voice, and the defendant made clear that he was prepared to proceed with the attorney. As a matter of fact, I think the judge really got very specific about it and said that, all right, you're not asking for a new attorney at this time, is that correct? I just had a couple of issues with him that I can take care of it later. And he said, over and over, I want to proceed, I'll go ahead. And then the trial went forward. And that was nine months afterwards, and what precipitated that discussion was that Mr. Boyce, Mr. Love's attorney, when they got there to start the hearing, said, I just learned that my client is asking for a new attorney. So it's clear that there's some ongoing problems or issues, but I acknowledge, as the court stated, that once they actually talked to him, Mr. Love says, I'll speak to the issues with my attorney. Well, even beyond that, though, counsel, Judge McKeown did something really unusual, I think, in the sense that when there was a motion for a new trial after that was all done, this was, yeah, motion for a new trial November 21st, 2011, and on January 5th, she issued an order denying the motion, but they had a hearing, looking back retroactively to everything that had occurred, all the things you're talking about, all the communications and examination of what had occurred, the repartee between counsel and the defendant during the trial, et cetera, et cetera. What possibly more could Judge McKeown have done to thoroughly ventilate this issue? Well, that hearing was mostly on the second motion for a new counsel. Admittedly, but nonetheless, she went through and examined exactly what had happened pre-trial, during the trial, post-trial, and concluded that there was no basis for it. What more could she have done, other than come to a different answer? I'm not sure what's more she could have done, but at the first hearing after the trial on that, after Mr. Love requested an evidentiary hearing, he specifically talked about bringing witnesses to show that his second motion for a new counsel was timely, and he said he was going to bring in the CO that could verify it was mailed on about May 11th, and Judge McKeown... All that does is to set up that he made certain claims at certain times, but Judge McKeown examined all those things, did she not? All these two mysterious communications that showed up after the fact, supposedly mailed at a different time, and show up in the court record. Whether or not they were bona fide, we don't have to get into, because she looked at that, did she not? She did, and again, that was mostly tailored to the second motion, this second motion for new counsel. My argument is on the first one... Motion for a new trial, was it not? Well, it was a motion for a new trial, and then they renewed the motion for new counsel, and argued that it was filed before... I guess your point on the first motion is that ideally she would have conducted a hearing or would have confirmed with him in some way that he agreed with this counsel's representation having filed the motion. Yes, especially when... I mean, that may be a little more prudent, but, you know, things unfold. She denied the pro se motion, and in it, she said, without prejudice, to renew it, and then let circumstances change. Right. Now, was there any communication at all after that? Nothing, right? There's nothing in the record other before... But I think that... My point is that counsel said that the defendant's request for new counsel was based primarily on not receiving discovery. That doesn't really jive with the 12 reasons he puts in the motion. There's sometimes in these instances where attorneys, and I'm not saying anything in this case necessarily with Mr. Boyce, but they have certain almost financial interest in continuing in the case when they're appointed, et cetera. And I think that when a client sends a pro se motion... to find that that's always the case, that there's a financial interest. It seems to me that raising that issue, if you're saying at the same time it doesn't apply to Mr. Boyce, is really makes... It's not a good argument. I'm not saying it doesn't apply to Mr. Boyce, but what I'm trying to say is that when you have to determine the adequacy of the inquiry, when a defendant files a pro se motion, makes specific complaints, it shouldn't be enough just to accept the representation of the attorney without hearing from the defendant. The court didn't on May 11th. What the court did before trial, just before trial, asked the defendant if he wished to proceed. The only thing he said was, well, I'll take it up with him. And then she went on to say, that's the way we resolve these things. So you'll have the opportunity to do that. And he never did. They went through the entire trial. And at no time did he complain and say, I need another attorney. Yes. Doesn't that really overcome all of that that proceeded, and particularly if there was some error with the process of getting that original pro se motion to the judge? I think you have to look at each motion for new counsel separately. That was in the context of what occurred at a hearing nine months afterwards, and probably has more bearing on his second motion for new counsel than in his first motion. But what happens? Are you saying that something happened in between where he didn't have good counsel? When in fact, just before trial, he's asked explicitly over and over. And I looked at that record, and I thought, wow, this is rather substantial what the judge did to make sure that there was no problem with counsel. And he said over and over, no, not, well, let's proceed, Your Honor. And if there's something, we'll take it up later. And she didn't even leave it there. She then said, okay, you'll have that opportunity. He never took the opportunity. What he said was, I do have issues with my attorney, but I would like to try to talk and resolve them with him at that point. And then he claims that the very next day, he sent a motion for new counsel to the court. And so it's clear that he has made multiple requests for new counsel. Okay. You've exceeded your time. Thank you. Thank you. We'll hear from the government. Good morning, Your Honors. May it please the Court. Mark Rahe for the United States. I will address the issues, the same sequence that my opponent did. On that first issue, as this Court knows, the standard review is very deferential. It's abuse of discretion. By the terms of the Constitution, venue is presumed in the state and the district where the offense occurred. The Supreme Court said in the Stilling decision six years ago that finding a presumed prejudice is supposed to be for the severe or the rare case. We would submit on the facts of this case that Judge McKeown properly exercised her discretion. And when she issued, I believe, a ten-page order going through every one of the arguments that the defense raised, that at the outset tells you that she had a very informed exercise of discretion. Now, with respect to the fact that this offense occurred at the courthouse, I think the panel has already pointed out a few salient facts. One, the bomb didn't go off in a courtroom. It was at the entrance to the courthouse. And what did Judge McKeown do? She specifically came up with a prophylactic measure. It says, we're going to direct you jurors, and all jurors are presumed to follow their instructions. You're going to take another entrance. That way we'll mitigate any possible concern. But more importantly, as I pointed out in my briefing, she vetted during voir dire the panel, specifically said, we're having this trial in the same place where the crime allegedly took place. Does anybody have a problem with that? I see no hands. And even after other people from that original panel were stricken for other reasons when the replacements came up, she went through that same process. Now, aside from that, time, I believe there's a Supreme Court case that we cite in our brief, the name escapes me, but they made a very pertinent point as well that says time tends to cure a lot of the problems from presumed prejudice. This bombing happened in May of 2008. The trial was three years later. I mean, that, and I know Judge Smith went over that topic with my opponent. We would say that's a very important circumstance here. And again, especially on deferential abuse of discretion review. In addition, the fact that nobody was killed or injured, the fact that this bombing happened at 140 in the morning, it was a Saturday night, but it happened technically early on a Sunday morning. By definition, the courthouse isn't open. There's no jurors there. You might have a different scenario here if, or concerns here if it had happened at noon on, you know, on a weekday and lots of activity at the courthouse and people were injured. Correct. It might be a different scenario completely. What about the argument that's made by defense counsel that, well, look, all of the judges in the district recuse themselves? Right. Isn't that, isn't that somehow relevant to the issue of whether or not the prejudice is presumed? I would respectfully submit no. And for the following reason, that is a different standard. For judicial recusal, it's any appearance of impropriety or bias. All of the judges are employees of that courthouse. I think when the court does that, that's a different thing than we're talking about presumed prejudice, which again is a standard that's very hard to satisfy. And I believe even Judge McKeown, this argument was raised below and she said that she didn't see how that affected the calculus. Because, you know, judges are held, it's a different standard, as you all know. If there's even the least appearance, they don't want any sense of bias. So, you know, this is an attack on the courthouse where I come to work every day and therefore, I think for that reason, that's a separate, a separate issue. But here, the fact that, you know, during Vardir, I mean, I believe even the Seventh Circuit in the Nettles case said if there are these kinds of emotional concerns, that's what directed Vardir is meant for. And here, when you have the court conscientiously going through that, and I think I also pointed out of interest, there was at least, or there were at least 20 pages of defense counsel Vardir, there wasn't a single question or a single challenge for cause to anybody on the grounds of a supposed emotional reaction. And the last thing I guess I would say with respect to that point, or that first issue on appeal, I believe the district court made this comment too. I mean, at some point, if you accept the defense theory of prejudice, that would be present at any courthouse. Because by definition, an attack, you know, a bomb, when a bomb is placed at the front of a courthouse, wherever you hold that trial in the United States, you're going to have a risk of the juror saying, wow, it could have been me. But as we said on the facts of this case, when the bomb goes off at 140 in the morning on a Sunday, and there's no ostensible attack on judges or on juries, then, you know, there is no evidence of any of this supposed emotional response that the defense hangs its hat on in that first claim. So I'll proceed to the second issue. The motion for new trial, I mean, it's the first one of these that I've litigated. I don't think you could find a more thorough record. Well, I mean, you have to look at a – there was the first motion in September. Correct. Okay. Now, the way the Court disposed of that motion is a little odd. It's not usually the way it's done. Arguably. Right? When I look at the – I mean, you've seen – you've seen – you know, it happens all the time. You know, counsel – defendants come in and say, Your Honor, I don't like my lawyer. I'm not getting along with my lawyer. You know, I – you know, I want a new lawyer. Got to – you know, he's not – he's not calling me every day. Right. He's not doing what – he's not filing the motions that I want him to file. Well, I think here – Usually when that happens, you know, you haul him into court. Right. And you have an – you have an exchange with the defendant, and you try to find out if there really is a true conflict. Now, that – that didn't happen here. Granted. And I know that the case law of the circuit says that hearings are usually the preferred way. But I believe it's either the Smith case, the McClendon case. The standard is as long as there are, under the circumstances, adequate information or sufficient basis to rule on the motion. And this Court is also very deferential. Obviously, district courts have very busy caseloads. Each case turns on its own factors. As we point out, for a court to rely – I mean, a defense counsel is still an officer of the court. And when a defense counsel in this case contacts chambers – I mean, when you look at that original September motion, it's 12 conclusory assertions. If you take all of them at face value, you would have to conclude that Mr. Boyce did absolutely nothing for the case. That wasn't true. When he contacts the clerk of the court and represents as an officer of the court, I've spoken with my client. He had two main issues. One was receipt of electronic discovery, because as the Court knows, I think there was 20,000-plus pages, a lot of forensics. He was – he wasn't getting the disks at first. Then he was having trouble using the hardware at the MCC. But he said Mr. Boyce represented that he had fixed that. Now, granted, Judge Pai's – yes, if there had been a hearing, that would have been better. But I think under the law of this circuit, when it's abuse of discretion, it's totality of circumstances, on those circumstances, I can't – I don't think it can be said that the district court committed reversible error. But more importantly, and I think even Judge McKeown, by the time this is all done in her January 2012 order, she has done a lot of this retrospectively. But a couple points. First of all, as Judge Silver is quoting, I believe we've got it on page 23 of the Supplemental Excerpts of Record, that May 10, 2011 colloquy. It is extremely thorough. And it's not just, oh, are you having a problem with your attorney for purposes of today's hearing, which was the motion in limine. No, I want to continue with Mr. Boyce. And the next question, do you want Mr. Boyce at trial? And remember, trial is only 13 days away. I like the whole other issue. So she says yes. So that right there, in Judge McKeown's order, said I've, you know, amidst the many grounds she had for denying the motion for new trial was, she found that that mooted any concerns that he might have had in September. I would submit that's reasonable. But then in addition, on that November 21st hearing, Mr. Boyce was present. And the only thing, well, one of the factual claims that my opponent made that I disagree with respectfully is that that was, that hearing was mostly about the second motion. Mr. Boyce was there to actually provide testimony as to what happened with respect to that first motion in September 2010. He was there in open court. He told Judge McKeown I contacted the clerk. I've had a lot of communication. So that was, in effect, the hearing on the September, even if the September motion should have had a hearing at the time. But I think, you know, the last thing I would say with respect to that, the motion for new counsel is that in the end, the defense got the hearing that they wanted. They had Mr. Boyce there. And what Judge McKeown did, it was so thorough. I mean, she, she ruled, at least with respect to that second motion, three separate grounds for why it should be denied. And even aside from the mootness, aside from the waiver, I would say the most important one that I would emphasize here today is that she actually reached it on the merits. And when, again, when all is said and done, if you look at this, the trial had already been continued twice. She said, and I believe Judge Smith was saying this too, I'm going to assume that this was timely filed, and I'm going to put myself back in the shoes that I was then. If you're going to come to me with a motion for new counsel two weeks before trial, that's not timely. In the case law of this circuit, it's very clear that district judges have maximum discretion when a motion for new counsel is brought on the eve of trial and it would require a continuance. And as the government pointed out, again, we had a lot of expert forensic people coming from Washington, D.C. with the bombing forensics. They'd already had two continuances. You'd have prejudice that way. You had the two cooperating witnesses who are still pending sentencing. To delay any longer would have prejudiced them as well. But even aside from the timeliness, she said there is no complete breakdown in communication. And this is probably the biggest point about all of these issues with new counsel, is I read the case law, you see these words, these qualifiers, there has to be a complete break, a total lack. Cases like Wynn, where the defense counsel said, yeah, he just stopped talking to me a few months ago, that's the kind of extreme situation that merits new counsel. This situation was anything but. Even though, obviously, the defense was dissatisfied at times. What was happening in the case between September, when the first motion was made, when the district judge took it off calendar, or denied it, and May, when there was the hearing? What was taking place? Were there any court motions? Were there any motions or anything? Was there any appearance in court or anything? Nothing? Everything was just proceeding along to trial? I think there were continuances. And then the fact that the May 10 hearing was on the trial, people were gearing up for it. You have a Daubert hearing on May 16th, that's exactly one week before the trial. So I think those kind of motions were going on. Counsel, what are we to make of the two communications, I'll call them, that appeared mysteriously, if you will, kind of extra officio, one of which was the, I think it was the one that the defendant wanted his former client, Gloria, I guess, to testify about. And yet he didn't, that was one of the reasons you said he needed new counsel. He didn't make any proffer as to exactly what would be said. What are we to make of those? Do we take those two communications into account? Do we treat them as being basically because there was no foundation laid for them? How do we treat those? If I understand you correctly, Your Honor, you're referring to the, at the motion for new trial hearing where the defendant said, he basically indicated he would have called another witness. I agree. There's not much in the record about what exactly that witness would have said. But as I do read it, I think the sole purpose for that witness would have been to prove that that motion was timely filed on the May 11 date. And so what I would say is, even if you assume that, the best situation for the defense such that that witness was called, that witness gave beautiful testimony that it was filed May 11, it still wouldn't, or May 10, it still wouldn't change the outcome because Judge McKeown, as one of her alternative bases said, I'm going to reach the merits and I'm going to assume it was timely filed. So for all practical purposes, Judge McKeown reached the merits, treated these two communications that we just referred to one there, but treated the two as if they had, in fact, been properly filed. Everything was wonderful and looked at it. Absolutely. Could I just shift gears for one moment because time is running out, but on the multiplicity argument, counts six and seven, why aren't those counts multiplicitous? On its face, right. Same explosive device. It is, but it's with respect to two different felonies. What's the best case law for that, as opposed to the fact that most of the case law, say for example, the firearms case law, focuses on the actual, as the unit, the firearm. And here we have one explosive device. In all honesty, Your Honor, I don't have, my best case law is the absence of Ninth Circuit case law. Well, there's the Zalapa case that is pretty analogous. That's the Title 26 with the machine gun. Yes, it's the one unit, one weapon. It's very analogous. It is, Your Honor. I mean, I understand the multiplicity, as this court has said, is often very difficult to figure out. All we're saying is that when it was never raised below, and if the standards... It's plain air, but still, I mean... Is it plain air? That's I guess the question that I have. How, under Zalapa, plain air, and I'm going to quote here, is so clear cut, so obvious, a competent district judge should be able to avoid it without benefit of objection. Now, here you have a very skilled former advocate judge who had this argument. We're talking about it even now, that there's conflicting authorities, authority outside the state, outside the circuit, excuse me. But let's just assume it is multiplicitous. Is it still plain air if it's not clear under our case law, and there's conflict outside? The government would submit it's not. Well, there really is no conflict outside our circuit. The one case, the Fifth Circuit case, says it's multiplicitous. And that case, I think it's a Fifth Circuit case, was in existence at the time that he was sentenced. It was. That's the Seventh case. Right. Yes. And if you look at Zalapa, Zalapa is very, I think it's very analogous to this situation. But in any event, it doesn't really make any difference in his sentence, does it? Because he got sentenced for, these sentences were run concurrently. Correct. If I'm not mistaken. No, that is correct. With 5, 6, and 7. Right. And then you agree on, I guess it's count 10, what has to go back or whatever has to be resentenced on. Right. That has to be cleaned up. Does that change the sentence in any way, that count 10? The one that has to go back. Right. And I believe, I mean, when it goes back, you know, maybe the sky's the limit, I don't know. But we're going to take the position that, you know, the court already had full briefing and full argument on those other counts and that they're not affected. Yeah. Okay. Thank you. Thank you. Can I make two quick points? Yes. One minute. It's all you get. Okay. On the last point the court just asked, I think that under the sentencing package doctrine, if you reverse on one count, the obstruction of justice, the court should be able to take that into consideration and reevaluate the sentence as a whole. The second point on the multiplicity argument, the government in its brief pointed to this court's decision in De La Fuente is saying an error cannot be plain where there's no controlling authority, and I took it on point. Well, what that case really says is, and I'm quoting, an error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results. And that states to another U.S. v. Thompson case, and both of those talked about a circuit split in other circuits, and that's why the issue could not be plain. But here, I mean, it affects Mr. Love maybe a small extent, but it is a very important issue for other people in other cases, and I think that when the unit of prosecution is the use of the explosive, it's multiplicity. But is that really it, though? The counsel has made the argument that Zalapa can be distinguished because, in fact, you're looking at the firearm, you're looking at the features of the firearm, a machine gun or a short barrel weapon or firearm, and here the unit might well be a different felony. So you'd have to go to another statute, criminal statute, to determine what the felony is as opposed to the definition within the statute. Isn't that a distinguishing feature that can be made? Well, I think that the gist of the offense is the verb, the use of explosive to commit a felony. In these cases where there's simultaneous one use of an explosive to commit two felonies simultaneously and the only authority on point that occurred in 2009 before the indictment or the trial goes our way, I think that the error is plain. Okay. Thank you, counsel. We appreciate your arguments. Interesting case.
judges: Paez, M. Smith, Silver